# IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

## CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>      Plaintiff,<br><br>vs.<br><br>NAVNEET C. BHOWNATH,<br><br>      Defendant. | **FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER ON MOTION TO SUPPRESS**<br><br>Case No. 2:06CR685DAK |

   This matter is before the court on Defendant Navneet C. Bhownath's Motion to Suppress Pursuant to *Miranda* [Docket No. 27], and Motion to Suppress Evidence Seized Pursuant to Warrant [Docket No. 28]. The court held an evidentiary hearing on the motion on May 30, 2007, and closing arguments on July 30, 2007. At the hearings, Defendant appeared and was represented by Ronald J. Yengich. Plaintiff was represented by Leisha M. Lee-Dixon at the evidentiary hearing, and Dustin B. Pead at the closing arguments. After the hearing on closing arguments, on August 13, 2007, Defendant submitted a supplemental memorandum. The court has carefully considered all pleadings, memoranda, and other materials submitted by the parties as well as the law and facts relating to these motions. Now being fully advised, the court renders the following Findings of Fact, Conclusions of Law, and Order on Defendant's motions to suppress.

## FINDINGS OF FACT

On March 2, 2006, Special Agent Corey Hubbert of the Federal Bureau of Investigation in Salt Lake City, Utah, was contacted by an attorney that represented the company Infinite Mind, L.C.  This attorney conveyed that Infinite Mind was the owner of a software program called "eyeQ," and the company had a copyright on the software and a trademark on the name "eyeQ." The attorney also reported that the software had been pirated and sold on the internet by a company called Snapdiscount.com.

Agent Hubbert's investigation revealed that Infinite Mind was the owner of the copyright on the software and owned the trademark.  Further investigation revealed that the identity of the computer which registered Snapdiscount.com was Navneet C. Bhownath.  Agents verified that Navneet Bhownath lived in an apartment located in Chicago, Illinois.  In addition, agents also verified that Bhownath had a mailbox, which was used as the business address for Snapdiscount.com, at a UPS store in Chicago located four blocks from Bhownath's apartment. Agent Hubbert then made an undercover purchase of the software from Snapdiscount.com.  After this purchase was made, on August 30, 2006, a criminal complaint was filed charging Bhownath with violations of federal law and issuing a warrant for Bhownath's arrest.

On September 7, 2006, Agent Hubbert traveled to Chicago, Illionois to execute the arrest warrant.  Prior to executing the arrest warrant, Agent Hubbert obtained a search warrant.  The search warrant permitted the agents to execute the warrant in Bhownath's home for all business records or bank records for Snapdiscount.com and Bhownath, all computer systems, and all production equipment for reproducing copyrighted materials.

Agent Hubbert came in contact with Bhownath at the apartment in Chicago early on Spetember 7, 2006.  Agent Hubbert asked Bhownath his name and if he was related to Snapdiscount.com.  Before Bhownath answered, Hubbert told him he needed to read him a document.  The document was the *Miranda* rights document.  Agent Hubbert went through this document step by step.  Bhownath invoked his *Miranda* rights, stated that he declined to waive his rights, and decided not to talk about the case.  No further questions were asked of Bhownath at that time.

 Bhownath did ask the agents to contact the South African Embassy, which they did.  No statements were made to Bhownath while the agents began to execute the search warrant.  Because the agents had arrived at Bhownath's apartment early in the morning, the agents allowed Bhownath to get shoes, clothing, and his cell phone while the agents executed the search warrant.  The agents then had Bhownath sit at a desk in his apartment for about ten minutes.  Bhownath called an attorney he knew to meet him at the courthouse.  The agents were at Bhownath's apartment for approximately thirty minutes.  A Chicago FBI agent drove Bhownath to the FBI offices in Chicago for processing.

 From the time Bhownath was contacted and invoked his *Miranda* rights to the time that he was taken to the FBI office in Chicago for fingerprinting and processing, no questions were asked of Bhownath.  Conversations did occur between Bhownath and the agents which related to general things about Chicago and Salt Lake City and other small talk.  The drive to the FBI office took between fifteen and twenty minutes, and processing at the FBI offices took about twenty minutes.  During that time, Bhownath was given some granola bars and water.

 After Bhownath was processed at the FBI offices, the agents took him to court to appear

before a Magistrate Judge. The drive from the FBI offices to the courthouse took approximately fifteen minutes. At the courthouse, Bhownath was put into the custody of the United States Marshals. Agent Hubbert left Bhownath with the marshals for about an hour or two. Agent Hubbert then picked him up and took him to meet with his attorney. Bhownath met with his attorney for about twenty minutes, and then Hubbert was told by the Assistant United States Attorney that Bhownath had fired his attorney. Court personnel then attempted to locate an attorney for Bhownath. It took approximately an hour to get Bhownath a court appointed attorney. During that time, Agent Hubbert went in and out of the room.

During this time, Bhownath and Agent Hubbert continued that have conversations unrelated to the investigation or charges. For example, Bhownath teased Hubbert about having a bald head by remarking that he could see that the Rogaine was working. At one point, Bhownath told Hubbert that he was a "corporate lackey." Hubbert asked him what he was talking about, and Bhownath responded that he couldn't believe that they were using public funds to help private companies. Hubbert again asked Bhownath what he meant, and Bhownath responded that if it wasn't for him people could not get cheap CDs. Once Bhownath's court appointed attorney arrived, Bhownath was taken before the magistrate judge for his first appearance.

During the search of Bhownath's apartment, Agent Hubbert seized a Sony Laptop computer. The evidence was then transported to Salt Lake City, Utah, by Agent Hubbert. The computer was then taken to the Regional Computer Forensic Lab for imaging. After imaging the original drives on the laptop, Agent Hubbert took the imaged copies and reviewed them on a viewing station using Encase, a computer forensic tool widely used by computer forensic

examiners. Agent Hubbert then ran a keyword search, looking for files and folders related to Infinite Mind and Snap Discount.

Several folders were labeled with eyeQ and SnapDiscount. Within these folders was information about selling eyeQ on eBay, Yahoo, and Amazon. The location of these files was c:\desktop\eyeQ\. There was also a folder that contained a backup copy of the SnapDiscount.com website. Located within one of the eyeQ folders was a disc image (ISO) of the eyeQ softwareCD. The location of the ISO was c:\documentsandsettings\admin\mydocuments\eyeQ\eyeQ+backup+ peopleCDbackup\eyeQ-dec152005.iso. The evidence was marked using the computer forensic software. Computer forensic agents processed the marked files, produced them on a DVD, and entered them into evidence. The imaged drives were returned to the evidence locker. Agent Hubbert prepared a FD-302 for the return of the search warrant to the assigned judge in Chocago, Illinois.

## CONCLUSIONS OF LAW

Bhownath seeks to suppress the statements he made to Agent Hubbert and to suppress the records seized from his computer because the search warrant was facially overbroad.

### A. Statements

Bhownath argues that his statements to Agent Hubbert should be suppressed because there was a violation of Federal Rule of Criminal Procedure 5(a). Rule 5(a) requires the police to take those who have been arrested for a felony without unnecessary delay to the nearest magistrate judge for an initial appearance. When the police fail to comply with the law, statements obtained in the interim are suppressed. The Tenth Circuit has explained that "'[t]he

manifest purpose of 5(a) is to make sure that an accused person is fully advised of all of his constitutional rights by a judicial officer—not an enforcement officer—before he makes any incriminating statement.'" *Thomas v. United States*, 394 F.2d 247, 249 (10th Cir. 1968). "But this does not mean that every incriminating statement made by an accused after an arrest and prior to appearing before a United States commissioner is inadmissible." The Thomas court recognized that in *Walton v. United States*, 334 F.2d 343, 346 (10th Cir. 1964), it had concluded that "'[t]here are no hard and fast rule as to what constitutes unnecessary delay. Each case must be determined on its own facts.'" *Id.* The court further explained that if "the delay is for the purpose of extracting a confession or incriminating statements, there is a violation of Rule 5(a) and the evidence is inadmissible." *Id.*

As in *Thomas*, the court concludes that there is no evidence in the record indicating that the delay was for the purpose of extracting incriminating admissions from Bhownath or of taking unfair advantage of him. The agents executed the search warrant at Bhownath's apartment in a timely manner, they proceeded to the FBI offices to process him, and then took him to the courthouse. The delay at the courthouse was caused by Bhownath's meeting with his retained counsel, his termination of that counsel, and the need to obtain a court appointed attorney.

In addition, this is not a case where a detainee was in the custody of the same agents for a prolonged period of time. Bhownath was driven the FBI offices by a Chicago FBI agent, he was turned over to the U.S. Marshals at the courthouse for a significant period of time, and he met with his first retained counsel for a period of time outside the presence of Agent Hubbert. Moreover, Bhownath was not formally questioned about the case in any way during this time.

There is no evidence that the delay in this case was for an improper purpose. Therefore, the court concludes that there was no violation of Rule 5(a).

Bhownath further asserts that once he invoked his *Miranda* rights all questioning should have ceased. Under *Miranda*, courts determine whether a detainee is in custody and whether interrogation continued after a detainee invokes his or her right to remain silent. There is no question in this case that Bhownath was in custody at the time the statements were made and that Bhownath had invoked his *Miranda* rights. The question in this case focuses on whether Agent Hubbert's statements asking Bhownath what he meant constituted interrogation.

The test for what constitutes custodial interrogation is whether the words or actions of the police officers were such that they should have known that those words or actions were likely to elicit an incriminating response. *Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980). Bhownath's statement to Agent Hubbert that he was a corporate lackey was volunteered and spontaneous. It was not the result of coercion, interrogation, or other pressures from law enforcement. While Agent Hubbert asked for clarification of Bhownath's statement, the court concludes that Agent Hubbert could not reasonably have expected Bhownath's response to be an incriminating statement. Agent Hubbert and Bhownath had been bantering back and forth regarding small talk. Bhownath's spontaneous decision to make a comment related to the case was a clear departure from the prior conversation. Therefore, the court concludes that there was no violation of *Miranda*.

B.  <u>Warrant for Computer Records</u>

"A search warrant is . . . impermissibly overbroad if it authorizes the search and seizure of evidence that is not supported by probable cause." *United States v. Leary*, 846 F.2d 592, 605 (10th Cir. 1988).  Because the probable cause in this case related to the illegal copying and sale of a computer program, Bhownath asserts that the warrant in question would be overbroad if it allowed for the seizure of evidence that did not pertain to the illegal copying and sale of the computer program at issue.

Bhownath contends that the warrants language allowed the agents to search for and seize a limitless array of computer files, not just those relating to the alleged crime.  Bhownath relies on a Tenth Circuit case stating that "[a] sufficiently particular warrant [is such] that the officer is prevented from generally rummaging through a person's belongings." *United States v. Patterson*. 64 Fed. Appx. 727, 729 (10th Cir. 2003).

The warrant in this case allowed the agents to search all the data contained on Bhownath's computer.  The court disagrees with Bhownath, however, that this is the digital era equivalent of rummaging.  The agents must be allowed access to all files on a computer to search for files and folders relating to the case.  The agents do so by searching all files for keywords.  They then look at the files and folders that contain those keywords.  The agents do not conduct a search by opening the first file, reading it, and then moving to the next.  Searches of a computer are methodically done on an imaged hard drive.

Bhownath's position would unnecessarily curtail the search for keywords in any file on the computer.  The agents are not in a position to know what type of file or folder a defendant

may use to store relevant information. If the court were to find the warrant facially overbroad, it would allow defendants to hide evidence of illegal conduct in unlikely places on their computer and escape the parameters of a warrant. Such a position is unworkable and unnecessarily limiting in the context of a computer search in a case such as this where a defendant is selling illegal products from a website associated with his home address and shipping products through an address associated with his home address. There was probable cause to search the computers at the address associated with the website. Given the facts presented in the affidavit, the computer at the residence was the most relevant source for information relating to the alleged crime. Therefore, the court concludes that the warrant was not facially overbroad with respect to the search of Bhownath's computer.

   Bhownath also argues the Leon good faith exception should not apply in this case because a reasonably well-trained officer would have recognized that the warrant extended beyond the probable cause. The Leon Court recognized that the good faith exception would not apply when "a warrant [is] so facially deficient—i.e., in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid." *United States v. Leon*, 468 U.S. 897, 899 (1984).

   Although the court does not agree that the warrant was facially overbroad, even if it was overbroad, the court concludes that the *Leon* good faith exception would apply. The agents conduct in searching the computer indicates that his understanding of the warrant was that he was allowed to search the hard drive for certain keywords related to the alleged crime. It was objectively reasonable for the officer to interpret the warrant as allowing him access to the

computer to conduct such a search. Accordingly, the court finds no basis for suppressing the evidence Bhownath seeks to have suppressed.

## CONCLUSION

Based on the above reasoning, Defendant's motions to suppress are DENIED.

DATED this 31st day of August, 2007.

>BY THE COURT:
>
>_____
>DALE A. KIMBALL
>United States District Judge